J-S20033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ROBYN HEFFERAN AND DANIEL HEFFERAN JR. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL FORBES | : | |
| | : | No. 1572 MDA 2023 |
| Appellant | : | |

Appeal from the Order Entered October 18, 2023
In the Court of Common Pleas of Berks County Civil Division at No(s):
07-3107

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:       **FILED: SEPTEMBER 30, 2024**

Michael Forbes ("Appellant") appeals from the order entered by the

Court of Common Pleas of Berks County denying his petition to open/strike a

default judgment entered in favor of Robyn Hefferan and Daniel Hefferan Jr.

("Appellees").  We affirm in all respects except for the trial court's calculation

of pre-judgment interest, which we vacate and remand for further

consideration consistent with this decision.

The trial court sets forth the pertinent procedural history and facts, as

follows:

> This case began with the filing of a writ of summons on April 5,
> 2007.  The writ of summons was served on the Defendant, Michael
> A. Forbes, on April 12, 2007.

---

[*] Former Justice specially assigned to the Superior Court.

After numerous notices of potential termination for inactivity and administrative reassignments, the Appellees, Robyn Hefferan and Daniel J. Hefferan, Jr., filed a complaint on September 14, 2016. As a result of the Appellant failing to answer the complaint, a default judgment was taken against him on May 26, 2017.

Approximately twenty-one (21) months after the entry of the default judgment, the Appellant filed a Petition to Open/Strike the Judgment on February 28, 2019. On August 3, 2020, the Honorable Judge James M. Lillis of the Court of Common Pleas of Berks County issued an order denying the Appellant's Petition to Open/Strike Judgment.

The Case was ultimately reassigned to the [Honorable James E. Gavin] for the purposes of conducting a trial on the issue of damages only. Trial was held on June 27, 2023, before the undersigned, sitting without a jury. On July 7, 2023, the [trial court] issued its decision awarding the Appellees compensatory damages in the amount of Thirty-Nine Thousand Two Hundred Sixty Dollars and Eighty Cents ($39,260.80) against [Appellant], together with interest accruing at a rate of six percent (6%) per annum accruing from April 30, 2005, until paid in full. The [trial court] also awarded Appellees punitive damages against the Appellant in the amount of Ten Thousand Dollars ($10,000.00) together with interest accruing at a rate of six percent (6%) per annum accruing from July 7, 2023, until paid in full.

The Appellant timely filed post-trial motions which were denied by [the trial court]. This appeal followed.

### **Summary of Facts**

The facts giving rise to this case occurred in April of 2005, at a time that the Appellees, Robyn Hefferan and Daniel J. Hefferan, Jr., were the owners of residential real estate, with a furnished home, located at 4746 Alisan Road in Reading, Berks County, Pennsylvania (hereinafter referred to as the "Hefferan Residence"). At that time, the Appellees were in the process of getting divorced.

Due to the issues associated with their divorce, the Hefferan Residence was exposed to sheriff's sale. The Appellant, Michael A. Forbes, took advantage of the sheriff's sale and purchased the Hefferan Residence in April of 2005.

At the time the Appellant purchased the Hefferan Residence, it was still in the possession and occupied by one or both of the Appellees. Without resort to lawful ejectment proceedings, Appellant told Appellees that he was the owner of their home and all of its contents. He also told Appellees that they must vacate the Hefferan Residence and if they did not do so, he would notify the police.

As a result of Appellant's threat of arrest, Appellees quickly vacated their home. Upon Appellees' departure, Appellant changed the locks on the Hefferan Residence. As a consequence, Appellant took and exercised exclusive possession and control over all of the contents and furnishings inside the Hefferan Residence.

Despite repeated requests by Appellees to retrieve the contents and furnishings inside their home, Appellant refused their requests or granted some of those requests under limited circumstances in which he exercised exclusive control. Appellant specifically told Appellees that the contents of the Hefferan Residence belonged to him and they had no right or interest in the contents of the Hefferan Residence.

The contents of the Hefferan Residence that Appellant took possession of consisted of assorted sofas, love seats, end tables, high back chairs, multiple brass lamps, a dining room set consisting of a table and chairs, a sleeping sofa with a matching love seat, an oversized chair, assorted decorative lamps, a three piece entertainment center, multiple televisions, multiple video cassette recorders, a brass fireplace screen along with a set of brass fireplace tools, a console table with a matching mirror, an oak top kitchen table with six chairs, a refrigerator, a coffee maker, a toaster oven, a microwave oven, a clothes washer, a clothes dryer, a full size sleeper sofa, a reclining chair, a coffee table, another entertainment center, an office desk, a high back office chair, a wood file cabinet, a steel drawer file cabinet, an office telephone, a fax machine, a brass headboard, a full size mattress, a full size box spring, a full size bed frame, a six-drawer dresser with a mirror, a chest of drawers, a night stand, a desk in a bedroom, multiple secretary chairs, multiple bedroom lamps, a solid cherry headboard, a king-size mattress, a king-size bedframe, assorted related solid cherry furniture in the master bedroom, a black lacquer bedroom set with mattress, box spring

and frame, a black lacquer dresser with mirror, multiple compact disc players/radios, a full-size oak headboard with a full-size mattress, box spring and frame, and oak chest of drawers and mirror, an oak high chest of drawers, an oak night stand, a maple twin head board with mattress, box spring and frame, a maple double dresser, a bookcase, a toy box, a basketball hoop and stand, a weed whacker, a lawn mower, a snow blower, a shop vac, a galvanized tub, a storage container, a girl's bicycle, a scooter, assorted hand/yard tools canned food items, liquor, office supplies, collectible toys, Christmas decorations, planters, assorted clothing, assorted jewelry, assorted dishes, glasses and pots and pans, outdoor picnic table, a Weber grill, and outdoor chairs and tables (hereinafter collectively referred to as the "Converted Personal Property").

Appellees attempted to arrange for the contents and furnishings inside the Hefferan Residence to be auctioned, but the Appellant interfered with the scheduling of the auction. Ultimately, Appellees were able to auction some items but only the items that Appellant allowed them to auction.

Among the items taken by Appellant was a bicycle that the Appellants had given their daughter. Appellant told Appellees that *his* daughter was enjoying riding *their* daughter's bicycle.

In April of 2007, Appellees initiated litigation against Appellant for conversion of the contents and furnishings of the Hefferan Residence. In May of 2017, a default judgment was entered against Appellant on Appellees' action for conversion of the contents of the Hefferan Residence.

Trial Court Opinion, 12/18/23, at 2-7

On February 28, 2019, [Appellant] filed a Petition to Open/Strike Judgment. On August 3, 2020, after argument was held, the Petition to Open/Strike Judgment was denied.

On April 11, 2023, an order was issued scheduling a non-jury trial on the issue of damages. Trial was held on June 27, 2023.

. . .

On July 7, 2023, after a trial having been limited to the issue of assessment of damages, [the trial court awarded damages in the

form of compensatory damages in the amount of $39,260.90 with an interest rate of 6% per annum accruing from April 30, 2005 until paid in full and punitive damages in the amount of $10,000.00 together with an interest rate of 6% per annum accruing from July 7, 2005 until paid in full].

In valuing the Converted Personal Property, the [trial court] considered that the assorted items were of varying ages, in varying conditions, and having had varying levels of use. It also considered that Appellant has deprived Appellees of the value of Converted Personal Property since April of 2005.

Trial Court Opinion, 7/7/23, at 1-2.

On July 17, 2023, Appellant filed a motion for post-trial relief, which the trial court denied in its entirety by Order of October 18, 2023. This timely appeal followed.

In Appellant's brief on appeal, he presents the following questions presented, which were first preserved by their inclusion in his court-ordered Pa.R.A.P. 1925(b) statement:

Did the trial court err in refusing to grant Appellant's Motion for Post-Trial Relief, inclusive of all subsidiary issues therein:

(A)    Judgment Non Pros should have been awarded in favor of Appellant due to Appellees' unjustified laches of 18 years.

(B)    Judgment Notwithstanding the Verdict should have been awarded in favor of Appellant or, alternatively, remittitur of damages or molding of the verdict, where Appellees failed to offer sufficient, nonspeculative evidence on compensatory damages and punitive damages.

(C)    The trial court erred in awarding prejudgment interest and in computing the amount thereof as having accrued from April 30, 2005.

Brief of Appellant, at 4.

In Appellant's first issue, he maintains reversal is warranted because Appellees were guilty of laches in the prosecution of their suit, which in turn caused him substantial prejudice in defending against it. Appellant initially sought the equitable remedy of laches in his 2019 Petition to Strike/Open Judgment, 21 months after the trial court had entered its 2017 default judgment in favor of Appellees. On August 4, 2020, Appellant's petition was denied.

> "The doctrine of laches is an equitable bar to the prosecution of stale claims and is the practical application of the maxim that 'those who sleep on their rights must awaken to the consequence that they have disappeared.'" ***Fulton v. Fulton***, 106 A.3d 127, 131 (Pa. Super. 2014) (internal citation omitted). "[T]o prevail on an assertion of laches, respondents must establish: a) a delay arising from petitioner's failure to exercise due diligence; and, b) prejudice to the respondents resulting from the delay." ***Id.*** (internal citation omitted). "The question of whether laches applies is a question of law; thus, we are not bound by the trial court's decision on the issue." ***In re Estate of Moskowitz***, 115 A.3d 372, 380 (Pa. Super. 2015), *appeal denied*, 634 Pa. 749, 130 A.3d 1291 (2015). Notably, the defense of laches is waivable. ***See id.*** (holding appellants waived any defense or argument based on laches for failure to raise such defense in response to estate's pleadings). ***See also In re Estate of Scharlach***, 809 A.2d 376 (Pa. Super. 2002) (holding appellee waived defense of laches for failure to raise it in any pleading before Orphans' Court).

***In re Est. of Coleman***, 315 A.3d 55 (Pa. Super. 2024)

Herein, Appellant attempts to distinguish his claim from that part of the trial court's Pa.R.A.P. 1925(a) opinion invoking both Pa.R.Civ.P. 1030(a) and interpretive decisional law requiring laches to be pled under New Matter in response to the commencement of an action lest it be waived, as he maintains that he asserts laches not in Appellees' commencement of their action but in

their prosecution of their suit. The trial court, however, addressed this alternate basis sounding in *non-pros* and determined the claim still afforded Appellant no remedy because he neither demonstrated prejudice by any delay caused by Appellees nor took timely action to protect his own interests.

For example, Appellant was served with a writ of summons in 2007 but filed nothing to compel Appellees to prosecute the action over the ensuing nine years culminating with Appellees' September 2016 filing of their complaint. Moreover, once served with the complaint, Appellant failed to file an Answer, prompting the trial court to grant a default judgment in Appellees' favor in May of 2017. Finally, another 21 months passed after the default judgment before Appellant filed his petition to open/strike judgment, which the trial court denied.

This record supports the trial court's determination that Appellant had forfeited the equitable relief he sought because he failed to take required action on his own in response to Appellees' alleged undue delay in advancing their action against him. Therefore, Appellant's first claim affords him no relief.

In Appellant's second question presented, he asks this Court to conclude the trial court erred by failing to award either judgment notwithstanding the verdict ("JNOV") or, in the alternative, a remittitur of damages or a molding of the verdict based on, what Appellant maintains, was Appellees' insufficient

and speculative evidence on compensatory damages and punitive damages.[1] Central to this issue is the trial court's acceptance of the Appellees' discovery submission of an inventory itemizing their marital property allegedly converted by Appellant when, immediately after his Sheriff's Sale purchase of Appellees' home, he unlawfully engaged in "self-help" eviction efforts and, in so doing, prematurely removed Appellees from their home by threat of arrest.

Appellant challenges both the inventory of the allegedly converted items and the Appellees' method of determining their respective values that were ultimately used by the trial court to calculate its damages award. He concedes the trial court's finding that, because he could neither specify the property left in the bedrooms and family room nor remember whether there was office furniture in the basement or unopened games and toys left behind, he was unable to contradict the testimony of Appellants as to such items' inclusion in their list of converted property. *See* Brief for Appellant, at 10-11. Another example of his admitted inability to remember the personal property within the home he acquired 18 years earlier was his testimony that he did not recall, and thus could not contradict, whether he callously told Appellees during the

_____

[1] At the outset of Appellant's second issue, he asserts that the trial court "erroneously believed it could not enter judgment notwithstanding the verdict for no other reason than because a default judgment was entered as to liability and, '[a]s such, the only issue before the court was damages.'" Brief for Appellant at 34 (quoting TCO, 12/18/23, at 11). From that bare assertion, however, he confines his argument to developing the position that Appellees failed to meet their burden of producing competent evidence of their sustained compensatory and punitive damages. Accordingly, we address only this developed part of his second issue.

time in question that his daughter was enjoying riding their daughter's bicycle—another item in the inventory of converted property as claimed by Appellees. N.T., 8/3/20, at 45-46.[2]

Notwithstanding Appellant's inability to contradict Appellees' identification of personal property converted, he maintains that it remained Appellees' burden to submit competent and admissible replacement cost evidence as to both the items converted and their respective values at the time of conversion. They failed to do this when they consulted internet pricing for brand new items of the same kind and quality as the converted property, he posits, for in so doing they did not offer their personal knowledge of the value of the property but, instead, relied on what he baldly asserts was hearsay evidence of present value. We disagree.

_____

[2] Though the trial court deemed Appellant's "callous" remark representative of what it found to be his overall contemptible behavior towards Appellees warranting the imposition of punitive damages, Appellant asks this Court to disregard the comment and reject the punitive damages award because Appellees acknowledged during trial that their daughters were ages 15 and 17 at the time in question and presumably would not have cared if Appellant's daughter was riding their daughter's bike. Appellant, however, misses the significance of the comment and how the trial court weighed it in making its punitive damages award determination. What the trial court deemed important in this regard was Appellant's aim to deride, degrade, and embarrass Appellees in what was manifestly a most difficult time for them. Indeed, there was no evidence that Appellant knew the ages of Appellees' daughters at the time, and it was thus within the ambit of the trial court's role as finder of fact to conclude that Appellant intended the remark to be injurious, in keeping with other salvos he directed towards Appellees. Accordingly, we find Appellant simply misconstrues the trial court's assignment of weight given to both the individual statement and his other behaviors that led to the imposition of punitive damages.

Our Court has reviewed damage awards in cases involving the valuation of converted property under the following rubric:

Generally, our review of damage awards is straightforward:

Our standard of review of a trial court's award of damages is narrow: In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence. If the verdict bears a reasonable resemblance to the damages proven, we will not upset it merely because we might have awarded different damages.

*McManamon v. Washko*, 906 A.2d 1259, 1285 (Pa. Super. 2006) (citations omitted). However, when evaluating the value of personal property that has been lost due to a defendant's wrongdoing, the analysis becomes slightly more complex.

. . .

"Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Brinich v. Jencka*, 757 A.2d 388, 403 (Pa. Super. 2000) (citation omitted). "[I]t is the traditional function of the fact finder in conversion actions to estimate damages." *Pikunse v. Kopchinski*, []631 A.2d 1049, 1051 ([Pa. Super.] 1993). Estimation of the damages, as opposed to more certain methods of valuation, is often necessary:

While the measure of damages for conversion is the market value of the converted property at the time and place of conversion, such a value is often unascertainable. It is also well-settled that mere uncertainty as to the amount of damages will not bar recovery where it is clear that the damages are the result of defendant's conduct. In addition, replacement cost as the measure of damages has been a long-established exception to the general rule as to market value of personal belongings:

What a thing will bring in the market at a given time is perhaps the measure of its value then; but it is not the only one. Many of the goods for which compensation is here asked were of such a character that their market value could not compensate for their loss, as, for instance, clothing and other personal belongings. It cannot be said that they had no value in the open market, since at public auction they would most likely have brought something, but manifestly the price they would have there commanded would not represent their value to the owner ... Where this is the case the just rule of damages is the actual value of the thing destroyed to him who owns it, taking into account its cost, the practicality and expense of replacing it, and such other consideration as in the particular case affect its value to the owner.

*Lloyd v. Haugh & Keenan Storage & Transfer Co.*, 223 Pa. 148, 72 A. 516, 518 (1909).

*Lynch v. Bridges & Co.*, [] 678 A.2d 414, 415-416 ([Pa. Super.] 1996) (some citations omitted).

In *Delahanty v. First Pennsylvania Bank*, [] 464 A.2d 1243, 1257 ([Pa. Super.] 1983), this Court described the fact-finder's role regarding the determination of damages as follows:

Though justice and public policy require that the wrongdoer bear the risk of uncertainty which his own wrong has created and which prevents the precise computation of damages, the fact-finder still may not render a verdict based on speculation or guesswork. Yet, the fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable and inferential, as well as upon direct and positive, proof. Thus, the law does not demand that the estimation of damages be completely free of all elements of speculation.

- 11 -

...

> Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences. Although the law does not command mathematical precision from evidence in finding damages, sufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture. Where the amount of damage can be fairly estimated from the evidence, recovery will be sustained even though such amount cannot be determined with entire accuracy. It is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss.

*Id.*, at 1257-1258 (citations omitted).

***Witherspoon v. McDowell-Wright***, 241 A.3d 1182, 1187–88 (Pa. Super. 2020)

In the case *sub judice*, the trial court found Appellees demonstrated reasonable and sufficient knowledge of their personal property values at the time of conversion by conducting their own research of present-day replacement costs and then offering into evidence such values that enabled the court to extrapolate a reliable estimate of 2005 values through application of appropriate consumer price indices.[3]  TCO, 7/7/23, at 7-10.  From that finding of fact, the court made the following determination:

---

[3] The trial court aptly observed that courts "may take judicial notice of the United States Bureau of Labor Statistics—Consumer Price Index pursuant to Rule 201(b)(2) of the Pennsylvania Rules of Evidence as a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." TCO, 7/7/23, at 9 fn. 2.

The [trial court] finds that [Appellees'] testimony about the present-day value of the Converted Personal Property is credible. The [trial court] finds that the present value of personal property that is similar or equivalent to the Converted Personal Property has a value of Seventy-Six Thousand Six Hundred Ninety-Eight Dollars ($76,698.00). The final determination of the value of the property converted at the time of the conversion, however, requires that there be two adjustments made to the present value. The first adjustment takes into account the Converted Personal Property was of varying ages and levels of use at the time of the conversion.

Beginning with the adjustment due to the conversion occurring in April of 2005, the [trial court] reviewed the United States Bureau of Labor Statistics—Consumer Price Index[]. In general terms, the Consumer Price Index is a measure of the average change overtime [sic] in the prices paid by consumers for consumer goods. Using the Consumer Price Index Inflation Calculator[], consumer goods that could be purchased in April of 2023 for Seventy-Six Thousand Six Hundred Ninety-Eight Dollars ($76,698.00) could have been purchased in April of 2005 for Forty-Nine Thousand Seventy-Six Dollars ($49.076.00).

Having adjusted the 2023 value to a 2005 value, the [Trial Court] then is applying depreciation for the age and general usage of the Converted Personal Property. The [Trial Court] accepts Mr. Hefferan's testimony, based upon his knowledge of his own property and his experience as an insurance claims adjuster, that the appropriate depreciation to be applied is twenty percent (20%). Applying this depreciation reduces the value of the Converted Personal Property at the time of the conversion to Thirty-Nine Thousand Two Hundred Sixty Dollars and Eighty Cents ($39,260.80).

Therefore, the [Trial Court] awards the Plaintiffs, Robyn Hefferan and Daniel J. Hefferan, Jr., compensatory damages in the amount of Thirty-Nine Thousand Two Hundred Sixty Dollars and Eight Cents ($39,260.80) for the value of the Converted Personal Property that was converted by the Defendant, Michael A. Forbes.

TCO, at 9-10.

Our review supports the trial court's determination that Appellees presented credible, reliable valuation data from their own research that provided the trial court a reasonable basis upon which to come to a fair and intelligent estimate of the property's value at the time of conversion. In arriving at this conclusion, we consider it significant not only that Appellees' pricing data enabled the court to employ a rational inferential method of value, but also that Appellant offered no contrary evidence at the time the trial court exercised its power as finder of fact to accept Appellees' valuation as a reasonably accurate basis for the calculation of compensatory damages.[4]

_____

[4] "[I]n a conversion action, it is for the trier of fact to consider the evidence of damages from both the plaintiff and the defendant and to measure the value of the damages in the context of [the] plaintiff's burden." **Witherspoon**, 241 A.3d at 1188 (quoting **Penn Electric Supply Co., Inc. v. Billows Electric Supply Co.**, 528 A.2d 643, 646 (Pa. Super. 1987). Regarding the parties' respective burdens in this process,

> [t]he cases hold that plaintiff is not relieved of the burden of proving the amount of damages simply because the defendant by his own wrong has precluded a more precise computation of damages. The general rule is that if the defendant wishes to argue for a reduction in damages or to rebut the adequacy of plaintiff's evidence, the burden of such a showing is on the defendant. But failure to meet this burden does not require the court to assess damages at whatever figure the plaintiff has shown, however uncertain.

**Id.**, at 645 (citations and quotation marks omitted).

**Witherspoon**, 241 A.3d at 1188.

- 14 -

Based on the decisional law cited above, we find no reversible error with the trial court's calculations.

In Appellant's final issue, he contests the trial court's award of prejudgment interest accruing at a rate of six percent (6%) *per annum* for the 18 years of delay between the April 30, 2005, conversion of property and the 2023 judgment because, he claims, Appellees failed to demonstrate they had no control over the protracted course of the litigation during this time. In fact, he attributes a substantial portion of the delay exclusively to Appellees, starting with the unexplained nine-and-one-half year interval between the 2007 filing of their Writ of Summons and the 2016 filing of their Complaint, and continuing with the subsequent two-and-one-half years of inaction before they hired counsel to proceed with the case. Other delays cited by Appellant include Appellees' failure to itemize damages promptly in response to Appellant's discovery requests, waiting until January 2022 before completing this task and enabling the trial court to commence with the 2023 trial.

We review an award of prejudgment interest for an abuse of discretion. ***Cresci Constr. Servs., Inc. v. Martin***, 64 A.3d 254, 258 (Pa. Super. 2013). An abuse of discretion is more than a mere error in judgment; rather, it requires a finding that the trial court overrode or misapplied the law, or that the decision was manifestly unreasonable or the result of bias, prejudice, partiality, or ill-will as evidenced by the record. ***Kraisinger v. Kraisinger***, 34 A.3d 168, 175 (Pa. Super. 2011).

"Our courts have generally regarded the award of prejudgment interest as not only a legal right, but also as an equitable remedy awarded to an injured party at the discretion of the trial court." **Somerset Community Hospital v. Allan B. Mitchell & Associates**, 685 A.2d 141, 148 (Pa. Super. 1996). Thus, while pre-judgment interest is awardable as of right in contract cases, it is also awardable as a matter of equity in other cases. **See Kaiser v. Old Republic Ins. Co.**, 741 A.2d 748, 755 (Pa. Super. 1999). "Pre-judgment interest in such cases is a part of the restitution necessary to avoid injustice." **Id**.

While the equitable principle of avoiding injustice warranted the inclusion of prejudgment interest as part of the damages awards fashioned in the present case, we are constrained to conclude that Appellees' protracted prosecution of their tort action—while not grounds for a laches-based judgment of *non pros*—appears to have been, to some degree, a function of their choice and a matter within their control. As such, it would follow that awarding interest on compensatory damages for the entire pre-judgment time in question would inaccurately and unfairly attribute all delay to Appellant and, thus, be inconsistent with the goal of avoiding injustice.

Therefore, cognizant that justice requires a complete damages award to Appellees for the deprivation they experienced from Appellant's act of conversion and the consequential delay in obtaining a remedy, we are compelled to remand this matter to the trial court with instructions to reexamine the pre-judgment timeline between the 2005 conversion of

property and the trial court's October 18, 2023, order with the discrete purpose of recalculating pre-judgment interest on the compensatory damages award in a manner consistent with the guiding equitable principle of avoiding injustice.

Order affirmed in all respects except for the calculation of pre-judgment interest. Case remanded consistent with this decision. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/30/2024